# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| KAYLYN FRANKS, | Case No.: 1:18-cv-00161-REB |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER RE:  DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** |
| vs. | |
| UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL., | |
| Defendants, | **(Dkt. 30)** |

Pending before the Court is Defendant's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment (Dkt. 30).  Having carefully considered the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I.  GENERAL BACKGROUND

Plaintiff Kaylyn Franks is a long-time employee of the Farm Services Agency ("FSA"), a division of the United States Department of Agriculture ("USDA") (collectively "USDA/FSA"). She sues her employer here, claiming that she was discriminated against because of her gender and also retaliated against for raising legitimate concerns of gender discrimination in the workplace.  *See generally* Compl, ¶¶ 13-31 (Dkt. 1).[1]  Defendant seeks dismissal of her claims, arguing that "(1) the acts and omissions Franks alleges are not adverse employment actions; (2) Franks was treated the same as similarly-situated males; (3) there were legitimate, nondiscriminatory reasons for all actions alleged; (4) Franks cannot establish a causal link between her gender and the acts and omissions alleged; (5) Franks has not shown retaliation in

---

[1]  Plaintiff additionally alleged a violation of her First Amendment Rights; however, that claim was dismissed on August 15, 2018.  *See* 8/15/18 MDO (Dkt. 12).

**MEMORANDUM DECISION AND ORDER - 1**

response to statutorily protected activity; (6) the vast majority of the purported acts and

omissions alleged are not actionable because they are time-barred; and (7) Franks's claims for

damages fail."  Def.'s MSJ, pp. 2-3 (Dkt. 30).

## II.  SUMMARY JDUGMENT STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or

defense, "there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  One of the principal purposes of summary

judgment "is to isolate and dispose of factually unsupported claims . . . ."  *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986).  It is "not a disfavored procedural shortcut," but is instead the

"principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and

prevented from going to trial with the attendant unwarranted consumption of public and private

resources."  *Id*. at 327.  "[T]he mere existence of some alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  There must be a genuine dispute

as to any *material* fact – a fact "that may affect the outcome of the case."  *Id*. at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and

the court must not make credibility findings.  *See id*. at 255.  Direct testimony of the non-movant

must be believed, however implausible.  *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir.

1999).  On the other hand, the court is not required to adopt unreasonable inferences from

circumstantial evidence.  *See McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine

dispute as to a material fact.  *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).  To

carry this burden, the moving party need not introduce any affirmative evidence (such as

affidavits or deposition excerpts) but may simply point out the absence of evidence to support

**MEMORANDUM DECISION AND ORDER - 2**

the non-moving party's case.  *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor.  *See Devereaux*, 263 F.3d at 1076.  The non-moving party must go beyond the pleadings and show "by her . . . affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists.  *Celotex*, 477 U.S. at 324 (internal quotation marks omitted).  However, the court is "not required to comb through the record to find some reason to deny a motion for summary judgment."  *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001).  Instead, the "party opposing summary judgment must direct [the court's] attention to specific triable facts."  *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

### III.  DISCUSSION

#### A.    Gender Discrimination Claim

Title VII makes it "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex"  42 U.S.C. § 2000e-2(a)(1) (emphasis added); *Lyons v. England*, 307 F.3d 1092, 1103 (9th Cir. 2002).  In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the United States Supreme Court established a three-stage, burden-shifting framework for courts to apply to Title VII gender discrimination claims.

Under that framework, "[a] discrimination complainant must first establish a prima facie case of disparate treatment."  *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 743 (9th Cir. 2004) (internal citations and quotations omitted).  "In general, a plaintiff must present evidence of 'actions taken by the employer from which one can infer, if such actions remain unexplained, that that it is

**MEMORANDUM DECISION AND ORDER - 3**

more likely than not that such action was based upon race or another impermissible criterion'" like gender. *Id*. (quoting *Gay v. Waiters' Union*, 694 F.2d 531, 538 (9th Cir. 1982)); *but see Coghlan v. Am. Seafoods Co., LLC*, 413 F.3d 1090, 1094 (degree of proof to demonstrate prima facie case is minimal and does not need to rise to level of preponderance of evidence).  If the plaintiff presents a prima facie case, "the burden shifts to the defendant to produce some evidence demonstrating a legitimate, nondiscriminatory reason for the employee's [treatment]." *Bodett*, 366 F.3d at 743 (citing *McDonnell Douglas*, 411 U.S. at 802).  And if the defendant meets that burden of production, "any presumption that the defendant discriminated 'drops from the case,' and the plaintiff must then show that the defendant's alleged reason for [the treatment] was merely a pretext for discrimination."  *Bodett*, 366 F.3d at 743 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993)).  A plaintiff may demonstrate pretext either directly, by persuading the court that discrimination most likely motivated the defendant, or indirectly, by showing that the defendant's proffered explanation is unworthy of credence.  *See Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998).  An explanation is considered unworthy of credence if it is internally inconsistent or otherwise not believable.  *See Chuang v. Univ. of Calif. Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000).  However, bare assertions of "discriminatory motivation and intent . . . are inadequate, without substantial factual evidence, to raise an issue precluding summary judgment."  *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983).

To present a prima facie case of gender discrimination, a plaintiff must show that (1) she belongs to a protected class; (2) she was performing according to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly-situated individuals outside her protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination.  *See*

**MEMORANDUM DECISION AND ORDER - 4**

*Chuang*, 225 F.3d at 1123 (citing *McDonnell Douglas*, 411 U.S. at 802).  Here, as a woman, Franks is a member of a protected class, and no one disputes that, as the District Director of the West District of the FSA in Idaho, she was performing her job satisfactorily.  Rather, the parties only dispute whether (1) Franks suffered any adverse employment actions; (2) if so, whether her male counterparts were treated more favorably; and (3) if so, whether there were legitimate, nondiscriminatory reasons for such actions, or whether they were merely pretextual.

Under Title VII, an "adverse employment action" is one that "materially affect[s] the compensation, terms, conditions, or privileges of . . . employment."  *Chuang*, 225 F.3d at 1126. Within her Complaint, Franks described "some examples of the gender discrimination to which [she] has been subjected" as including:

- "On May 3, 2017, during a Leadership Meeting, a prior District Director publicly divulged negative, confidential information regarding Plaintiff's past performance as a District Director for the USDA/FSA";

- "On January 19, 2017, Plaintiff was denied an *ad hoc* telework agreement, when similarly-situated male counterparts were allowed such telework agreements";

- "On October 5, 2016, Plaintiff was reprimanded for an alleged failure to adhere to the travel voucher policies of the USDA/FSA, when similarly-situated male counterparts were not reprimanded for committing the same alleged violations";

- "During Plaintiff's performance review for fiscal year 2016, Defendant failed to recognize some of her significant accomplishments, and she received a lower performance rating than was deserved";

- "On various occasions, including in April 2016, Plaintiff's travel authority was limited, she was required to request approval for a privately-owned vehicle ("POV"), and approvals of her requested travel vouchers were delayed, while her similarly-situated male counterparts were not subjected to such conduct and had their requested travel vouchers timely approved";

- "On various dates in 2016, Defendant denied Plaintiff's repeated requests for additional staffing and undermined her efforts to improve her District offices, while similarly-situated male counterparts were not subjected to the same difficulties and were granted additional staffing to meet the needs of their respective offices";

**MEMORANDUM DECISION AND ORDER - 5**

- "Defendant denied Plaintiff the opportunity to participate in a conference call with officials regarding late crop reports and disregarded her memorandum to address this issue and propose changes that would improve this issue";

- "Defendant ignored Plaintiff's requests to include her staff's significant farming duties, which resulted in understaffing and criticism of Plaintiff's job performance, though Defendant did not ignore the staffing needs of Plaintiff's similarly-situated male counterparts";

- "Defendant would not allow Plaintiff to attend official visits to Native American reservations, which were being made on behalf of the USDA/FSA, though Plaintiff's similarly-situated male counterparts regularly participated in these official visits to the reservations";

- "Defendant would ignore Plaintiff's requests for guidance on hiring and staffing, though Defendant would not ignore such requests from Plaintiff's similarly-situated male counterparts";

- "Defendant ignored Plaintiff's repeated requests for assistance with her late crop reports, and she was told to figure it out herself; Defendant did not take this approach with Plaintiff's similarly-situated male counterparts";

- "Defendant threatened to remove all vehicles from Plaintiff's District as a result of her enquiries into the reimbursement policies and rules relative to late filing fees";

- "Defendant regularly chastised Plaintiff for making legitimate enquiries into how to perform her job duties, though Defendant would not take such an approach with Plaintiff's similarly-situated, male counterparts";

- "Defendant would make random enquiries into Plaintiff's reporting of her time and attendance reports, though Defendant would not take such an approach with Plaintiff's similarly-situated male counterparts";

- Defendant would not notify Plaintiff of various visits which were made by upper management to Plaintiff's offices, though Defendant would not take such an approach with Plaintiff's similarly-situated male counterparts";

- "Defendant regularly failed to recognize Plaintiff's notable, professional accomplishments, though Defendant would not take such an approach with Plaintiff's similarly-situated, male counterparts";

- "Defendant's management avoided communicating with Plaintiff on the phone, sent condescending e-mails to her, and responded to her in meetings and

**MEMORANDUM DECISION AND ORDER - 6**

conference calls in a condescending manner, though Defendant would not take such an approach with Plaintiff's similarly-situated male counterparts";

- "On January 18, 2017, Defendant's management made false comments about Plaintiff which materially and substantively affected her position, though Defendant would not take such an approach with Plaintiff's similarly-situated male counterparts"; and

- "On January 19, 2017, during an official meeting, Defendant's management, specifically Mark Samson (the former State Executive Director of the USDA/FSA in Idaho) publicly and specifically advised Plaintiff to refrain from filing any discrimination complaints against the new, incoming leadership for the USDA/FSA in Idaho."

Compl., ¶¶ 14(a-s) (Dkt. 1); *see also id.* at ¶¶ 19-20 ("Defendant's disparate treatment of Plaintiff was based on Plaintiff's gender and is set forth, in part, in ¶¶ 14(a)-14(e), *supra.* The actions of Defendant in discriminating against Plaintiff because of her gender are in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)-5, *et seq.*, which prohibit discrimination in employment on the basis of gender.").

Defendant disagrees, arguing that Franks, as the District Director of the West District of the FSA in Idaho for the last 22 years (the highest position and paygrade a non-political appointee can hold within the Idaho FSA), "has not been demoted, suspended, had her pay cut, lost any benefits, or been subjected to any formal discipline," and that, "[a]ccording to Franks, the only change that has occurred to the terms and conditions of her employment is that the West District's headquarters was changed from her personal residence in Boise to the District's largest field office, which is in Caldwell."  Def.'s Mem. ISO MSJ, pp. 1-2 (Dkt. 30-1); *see also id.* at pp. 2, 11 ("While Franks has asserted claims for gender discrimination and retaliation, she cannot recall anyone at the FSA saying anything derogatory to her about her gender.  And she cannot recall anyone at the FSA teasing her about her gender within at least the last five years. . . . Franks admits that no one at the FSA has ever made any derogatory statements to her about her gender and that, within at least the last five years, no one has teased her about her gender.

**MEMORANDUM DECISION AND ORDER - 7**

Nevertheless, in this litigation, Franks has blithely claimed that many of her long-time colleagues discriminated against her based on her gender.").[2]

In turn, Defendant attempts to identify various perceived slights – likely a function of testing the allegations within Franks's Complaint during discovery to help pinpoint (or, at the very least, rule out) those particular actions that do and/or do not form the bases of Franks's gender discrimination claim – that, while possibly representing adverse employment actions in Franks's mind, actually do not.  For instance, Defendant argues that:

- "The other District Directors did not use their personal residence as their District's headquarters";

- "The delay in approving Franks's telework agreement was justified";

- "Standing alone, a "Fully Successful" performance rating does not constitute adverse employment actions";

- "Franks purportedly being skipped over for the state interview board had nothing to do with her gender and did not cause her any harm";

- "The staffing formula applies equally to all Districts and does not affect the terms and conditions of Franks's employment";

- "The decision regarding where to assign newly-received, full-time equivalent positions did not affect the terms and conditions of Franks's employment";

- "The travel policy was applied equally";

- "The purported threat to remove the District's vehicles was not an adverse employment action towards Franks";

- "Franks canceled the conference call that had been scheduled with the Deputy Assistant for Farm Programs"; and

---

[2]  Even if true, if there are no instances of anyone saying anything disparaging to Franks about her gender, that would help establish only that there may be no direct evidence of gender discrimination.  A plaintiff who has no direct evidence of discrimination may still prove discrimination using indirect, or circumstantial evidence, under the *McDonnell Douglas* framework.  *See, e.g.*, *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121-22 (1985) ("*McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination").

**MEMORANDUM DECISION AND ORDER - 8**

- "[State Executive Director Mark] Samson invited Franks to go with him on his one visit to the Duck Valley Indian Reservation."

*Id*. at pp. 16-25.  According to Defendant, because none of these actions amounts to a requisite adverse employment action, there can be no gender discrimination claim tethered thereto.

Franks does not address these arguments specifically.  Instead, she says the "factual record speaks loudly" to reveal "a series of discriminatory and retaliatory abuses suffered by Plaintiff from Mr. Samson's and Mr. Johnson's [(the farm loan program chief)] preferential treatment of Plaintiff's lateral, male workers."  Opp. to MSJ, p. 6 (Dkt. 35).[3]  For example:

- "Plaintiff was not compensated for personal time in operating her own motor vehicle to and from her workplace";

- "Plaintiff was the only District Director with USDA/FSA who had her work headquarters changed to a rather lengthy distance of 22 miles from her home, and Plaintiff requested that a General Services Administration ("GSA") vehicle be made available to her, so she would not have to put as many miles on her personal vehicle.  Mr. Samson denied these requests.  Plaintiff then requested a GSA vehicle be kept at the Caldwell office.  Mr. Samson again denied this request.  Having to use her personal vehicle caused damage to Plaintiff in the form of wear and tear on her vehicle and the payment of mileages to her for having to use her personal vehicle . . . ."

- "Layne Peterson, a male coworker, was hired by Defendant to be the District Director, and his official duty station was in Pocatello, Idaho.  He was provided a GSA vehicle to travel between his home in Preston, Idaho to his Official Duty Station ("ODS") in Pocatello.  This is approximately 75 miles of driving each direction.  However, Mr. Peterson's residence in Preston is only three miles from the USDA/FSA service center in Preston.  Nevertheless, Mr. Peterson, a similarly-situated male coworker to Plaintiff, was allowed to keep his GSA vehicle in Preston, his residence, and use it to drive to his ODS in Pocatello.  Mr. Samson, on behalf of Defendant, refused to afford me the same terms of my employment, though Mr. Peterson's and my circumstances were basically the same."

---

[3]  Franks's Opposition (Dkt. 35) was not filed on time (though, oddly, her Statement of Disputed Facts (Dkt. 34) was).  In turn, Defendant argues that Franks's Opposition should be stricken.  *See* Reply ISO MSJ, p. 8 (Dkt. 37).  The Court does not condone a late filling, but also acknowledges that its effect presents an unusual circumstance here, especially in light of Local Civil Rule 7.1(e)(2).  Ultimately, however, the Court's decision on Defendant's Motion does not require the Court to address the question.  *See infra*.

- "On June 13, 2019, Ben Young, a newly hired District Director who replaced Layne Peterson, said in a meeting there have always been two GSA vehicles in Preston, and Brandi May, Administrative Chief, stated that situation had to change.  She said one of those GSA cars would need to be located in Pocatello because that is where the vehicle was required to be parked.";

- "Mr. Peterson was allowed to keep his GSA vehicle in Preston, Idaho, until he retired on January 1, 2019; he used this vehicle to commute to his travel headquarters in Pocatello.  To Plaintiff's knowledge, Mr. Preston never incurred personal expenses to commute from his residence to his travel headquarters with Defendants.  Plaintiff believes that this example demonstrates the gender discrimination to which she was subjected during her employment with Defendant."

- "From October 2015 through January 2018, Plaintiff was required to commute 22 miles taking 30 minutes of her own time each way to Caldwell, Idaho, from Boise, Idaho, at Plaintiff's own expense three to four days per week; whereas Mr. Peterson, also a District Director and thus a similarly-situated male employee to Plaintiff, was not required to have the same expenditure of unpaid, personal time and wear and tear on his personal vehicle.  From January 2018 to the time of the filing of this document with the Court, Plaintiff has been required to commute to and from Defendant's workplace five days per week at Plaintiff's own expense, on Plaintiff's own time, and in her own personal vehicle.  This directly affected Plaintiff's income, because Plaintiff was paying out-of-pocket commuting expenses, which her similarly-situated male counterparts were not required to pay.  It also affected Plaintiff's ability to do Plaintiff's job effectively, because she spent an additional 1-1.5 hours driving to and from Plaintiff's office located near Caldwell, as the drive time varied due to the number of motor vehicle accidents and the volume of traffic between Caldwell and Boise."

- "Plaintiff also incurred additional, commuting expenses from October 16, 2018, to the present, which her similarly-situated male counterparts were not required to incur . . . .[(going on to discuss mileage expenses, depreciation values, vehicle maintenance expenses, and value of personal time commuting)]"

- "Mark Samson's failure to adequately assess my performance has resulted in loss of monetary awards equaling $1,032.00 per year.  This amount was calculated at the rate of 1% of Plaintiff's annual salary, which is in line with FSA National notices existing from 2015 to 2018."

- "Defendant's current staffing formula for Idaho USDA/FSA has been analyzed to determine the impact to staffing in relation to the former workload model used in 2014 and the 2018 Optimal Performance Office ("OPO") data developed by the Defendant's national headquarters in Washington, D.C. . . . The comparisons [of the Districts] factually illustrate that Plaintiff has been

**MEMORANDUM DECISION AND ORDER - 10**

treated differently than her similarly-situated male counterparts relative to the staffing she was afforded as the District Director of Defendant's West District of the Idaho FSA office."

- "When comparing the 2014 staff share to the 2019 Idaho Adjusted Staff Share, Plaintiff compares to the other District Directors for USDA/FSA, who are all similarly-situated male coworkers as follows: (1) Scott Riggers's (North) staff increased 106%; (2) Kaylyn Franks's (West) staff has decreased 30%; (3) Curtis Warner's (East) staff has decreased 18%; (4) Layne Peterson's (South) staff increased 108%."

- "When comparing the OPO Staff Share to the Idaho Adjusted Staff Share, the following information becomes clear: (1) Scott Riggers's (North) staff needs were 3% higher than the Idaho Adjusted Staff Share; (2) Kaylyn Franks's (West) staff needs are 32% higher than the Idaho Adjusted Staff Share; (3) Curtis Warner's (East) staff is 6% lower than the Idaho Adjusted Staff Share; and (4) Layne Peterson's (South) staff is 15% lower than the Idaho Adjusted Staff Share."

- "When comparing 2014 Staff to the Idaho Current Staff, the following information becomes clear: (1) Scott Riggers's (North) staff was unchanged and remained the same; (2) Kaylyn Franks's (West) staff was decreased by seven full-time employees; (3) Curtis Warner's (East) staff was decreased by one full-time employee; and (4) Layne Peterson's (South) staff was increased by two full-time employees."

- "The effects of losing seven full-time employees outside the staff share statistics . . . has greatly affected Plaintiff's ability to do her job since October 2016 for the following reasons: (1) Plaintiff has assisted Defendant's other District offices, outside of the West District directed by Plaintiff, 240 hours with their day-to-day activities in order for those other offices to complete their workloads; (2) Plaintiff has spent 720 hours coordinating the details of employees, in other District offices outside of Plaintiff's West District, developing training for new employees, staffing those offices, and otherwise assisting with their workloads, though such were not within her job duties; (3) Plaintiff personally staffed several of Plaintiff's West District office for 160 hours in order to keep that office open; and Plaintiff spent 336 hours communicating verbally or in writing to defend Plaintiff's staff's inability to complete workloads timely due to the insufficient staff at Defendant's West District."

*Id.* at pp. 6-11 (internal citations omitted).

From this, the gender discrimination-related arguments contained in Franks's opposition to Defendant's Motion for Summary Judgment mostly track with certain (but not all) of the

allegations initially contained within her Complaint.  Even so, Franks's claims in this respect

have morphed over time (likely following discovery and in response to Defendant's summary

judgment arguments).  It appears to the Court that Franks's gender discrimination claim has been

distilled down to include only those actions explicitly cited by Franks in her briefing to represent

actionable discriminatory conduct, to wit:  (1) the relocation of the West District's headquarters

from Boise to Caldwell; (2) a lack of access to GSA vehicles and compensation of travel time;

(3) a failure to adequately assess her performance, making her ineligible for higher monetary

awards; and (4) the creation and adoption of a new staffing formula, disproportionately

impacting Franks's West District.  *Compare supra* (discussing alleged adverse employment

actions as identified within Franks's briefing)*, with* Def.'s Reply ISO MSJ, pp. 3-4 (Dkt. 37)

(consolidating Franks's allegations of Defendant's acts or omissions into separate bases for her

gender discrimination claim); *see also* Dist. Idaho Loc. Civ. R. 7.1(e)(2).[4]

However, these actions – even when viewed in the light most favorable to Franks – are

(1) not adverse employment actions, or (2) even if so construed, are applied equally to similarly-

situated male counterparts and/or are justified by legitimate, nondiscriminatory reasons, without

any evidence of pretext.  For example:

- West District Headquarters

Prior to 2007, the West District had a field office in Meridian, Idaho, which served as its

headquarters and was the office out of which Franks was based.  *See* Def.'s Mem. ISO MSJ, p. 6

---

[4]  During oral argument, Franks's attorney suggested that there are actually only two
factual disputes – (1) Franks's access to GSA vehicles and associated reimbursement of travel
expenses, and (2) whether the West District office was staffed commensurately with other
District offices.  Thus, in this setting, Defendant's Motion for Summary Judgment is granted, to
the extent that its arguments concerning other *possible* bases for Franks's gender discrimination
claim are neither confirmed, nor even addressed, by Franks herself in her briefing on the matter.
*See* Fed. R. Civ. P. 56(e)(3).  Despite the apparent further narrowing of issues during oral
argument, the Court will address those arguments referenced in Franks's briefing here.

**MEMORANDUM DECISION AND ORDER - 12**

(Dkt. 30-1).  When that office closed, the West District's headquarters became Franks's house and she began working from her home in Boise.  *See id*.  No other District headquarters was situated at a District Director's personal residence.  *See id*. at p. 16.  This arrangement continued from 2007 to mid-October 2015 when Mr. Samson recommended that the West District headquarters be moved from Franks's house to the Caldwell field office.  *See id*. at p. 6.  Franks was not a fan of this change because it meant that her home was no longer also her duty station and, therefore, she would have to commute 22 miles from home in Boise to an office in Caldwell.  *See id*. at p. 7.  Nonetheless, Mr. Samson then agreed to a telework agreement that began in November 2015, allowing Franks to telework up to two days a week.  *See id*.  No other District Director had a similar telework agreement.  *See id*.

The decision to move the West District headquarters from Franks's personal residence in Boise to Caldwell does not clearly represent an adverse employment action, particularly when its headquarters had already been located in Meridian (which necessarily required Franks to travel) before being moved to Boise.  Perhaps it was less convenient for Franks, but her earlier employment did not include such a convenience.  But even if it is considered an adverse employment action, similarly-situated male District Directors were not treated more favorably; quite the opposite actually, as no other District was headquartered at a District Director's personal residence and no other District Director had a telework agreement.  *See supra*.

Regardless, there were legitimate, nondiscriminatory reasons for changing the West District headquarters to the Caldwell field office.  According to Mr. Samson:

> Around October of 2015, I recommended that the West District headquarters be moved from Franks's personal residence to the Caldwell field office.  I made this recommendation for a number of reasons.  I had concerns about the lack of direction of the office and its performance based on my own observations when I visited the office and had been informed that a local producer had made a complaint.  It was the District's largest field office and was the closest filed office to Franks's home so I thought it made sense to make that office the headquarters.  In addition, I did

**MEMORANDUM DECISION AND ORDER - 13**

not think that it made fiscal sense to reimburse Franks for mileage every time she
drove from her home office to the largest and closest field office in the District.
Also, there was an FSA vehicle at the Caldwell field office that Franks could use
when she had to travel for work.

Samson Decl., ¶ 7 (Dkt. 30-15).  Franks has no answer to this justification supplied by Mr.

Samson.  *See* Def.'s Reply ISO MSJ, p. 4 ("Franks has not made any effort to meet her burden of

establishing that these reasons were actually a pretext for gender discrimination.").  Therefore,

even if Franks can make out a prima facie case of gender discrimination premised upon Mr.

Samson's decision to move the West District's headquarters from Franks's personal residence,

there are legitimate, nondiscriminatory reasons in the record supporting the decision regardless.

Defendant's Motion for Summary Judgment is granted in this respect.[5]

- Availability of GSA Vehicles and Travel Reimbursements

When Mr. Samson took over as the State Executive Director of the USDA/FSA in Idaho

in 2014, he sought to ensure that all FSA employees adhered to a travel policy as one means of

managing the agency's budget.  Doing so required (1) use of a GSA or FSA vehicle if available;

---

[5] Defendant separately argues that any purported discriminatory act taking place before
October 7, 2016 is time-barred.  *See* Def.'s Mem. ISO MSJ, pp. 27-29 (Dkt. 30-1) ("According
to EEO records, Franks first contacted the EEO to request counselling on November 21, 2016.
Forty-five days before that would have been October 7, 2016.  In light of 29 C.F.R.
§ 1614.105(a)(1), any purported discrete acts of discrimination occurring before October 7, 2016
are not actionable because they are time-barred.").  Franks counters that "none of [her] claims
are time-barred," that "there is no limitations defense here to anything but isolated acts occurring
in 2015, and that the continuing violation doctrine applies in any event.  *See* Opp. to MSJ, pp.
15-16 (Dkt. 35).  This argument misses the point; not only did the headquarters for the West
District change in 2015 (a discrete event), the continuing violation doctrine more appropriately
applies to cumulative effect of individual acts in a hostile work environment context.  *See, e.g.*,
*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115, 122 (2002) ("We conclude that a Title
VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge
within the appropriate time period . . . .  A charge alleging a hostile work environment claim,
however, will not be time-barred so long as all acts which constitute the claim are part of the
same unlawful employment practice and at least one act falls within the time period.").  This
circumstance therefore provides an additional basis to reject this element (as well as any other
claim based upon an alleged discrete discriminatory/retaliatory act before October 7, 2016)  of
Franks's discrimination claim.

**MEMORANDUM DECISION AND ORDER - 14**

(2) if not, using another government vehicle; (3) if neither of these options work, determine whether it would be less expensive to use a rental car than a personally-owned vehicle; and (4) if it will not be, use a personally-owned vehicle. *See* Samson Decl., ¶ 12 (Dkt. 30-15).  The District Directors were expected to comply with this travel policy. *See id*.  To the extent Franks claims that she routinely did not have access to a GSA/FSA vehicle (and that other similarly-situated male District Directors did) or that Mr. Samson denied her request that a GSA vehicle be kept at the Caldwell office, her deposition testimony does not support that claim:

Q:      And when you – you indicated earlier that you drive to Caldwell, and then you will use a government vehicle from there if you need to go visit an office or something like that; right?

A:      Correct.

Q:      What sort of vehicle do you use – what sort of government vehicle do you use when you do that?

A:      It's a Ford Explorer, and the year of it would be 2014.

Q:      And how long has that Ford Explorer been the car that you use for government travel?

A:      Ever since I've been in Caldwell.

Q:      *So do you use that Ford Explorer pretty much any time you have to do government travel?*

A:      *It – today, it is used 99 percent of the time.*

Q:      *So you use the same 2014 Ford Explorer for 90 percent – 99 percent of your government travel?*

A:      *Yes.*

Q:      *Correct?*

A:      *Correct.*

Q:      Did you ever have to use the Dodge Avenger?

A:      Yes.

**MEMORANDUM DECISION AND ORDER - 15**

Q:      Okay.  When did you use the Dodge Avenger?

A:      In the very beginning, when I was – let's see.  Let me back up.  July of 2015
        is when I had to start using the Dodge Avenger.

Q:      How long did you use the Dodge Avenger?

A:      Through the time that I was – my headquarters was moved to Caldwell.  So
        October 15th of 2015.

Q:      Okay.  So you used the Dodge Avenger from approximately July of 2015
        to October of 2015?

A:      Correct.

Q:      And, then, after that, you started using the Ford Explorer?

A:      Yes.  I recall using the Avenger maybe once or twice after that, but then it
        was exclusively the Explorer.

Q:      And do you have to do anything, like, to reserve the Ford Explorer to use
        for your daily, you know, trips?

A:      We have a calendar in the Caldwell service center where we go in, and we
        put the date that we plan to use it.

Q:      *Okay.  Do you ever have any trouble reserving the Ford Explorer?*

A:      *There's been a couple occasions, but we worked it out.*

Q:      *When you say you worked it out, who did you work it out with?*

A:      *The manager.  There's two managers there that I work with.  I share the
        vehicle with all of the other employees there.  And when it doesn't work – if
        the Ford Explorer is reserved, then we have the option of going to NCRS,
        Natural Resource Conservation Service, who is also located there; and it
        has vehicles.*

Q:      *And how often do you go use NRCS vehicles?*

A:      *I have used it once.*

Q:      *So, generally, if you want the Ford Explorer, you can reserve it?  There is
        no problem?*

**MEMORANDUM DECISION AND ORDER - 16**

A:   *Correct.  We have an agreement that the person driving the farthest gets the Ford Explorer.*

Franks Depo. at 53:17-56:3, attached as Ex. A to Wucetich Decl. (Dkt. 37-3) (emphasis added).

Moreover, Franks testified that she had the ability to keep a GSA vehicle at her house overnight, but she opted not to because it could not then be used for personal travel after work:

Q:   Okay.  So was the Caldwell office the closest office to you?

A:   Yes.

Q:   I want to make sure I understood something you testified to earlier.  You said that part of the rationale in changing your office from your home office to the Caldwell office was to save on travel expenses; correct?

A:   Correct.

Q:   Because, before, the headquarters was your home office, when you went to go visit Caldwell, you would be incurring mileage; correct?

A:   Sometimes I did.  the majority of the time, I was traveling to the state office, which is seven miles from my home, getting a GSA vehicle, and then traveling to the east.  All of my offices are east of the state office, except for Caldwell and Emmett.

Q:   *When you visit one of those offices in the east, do you ever check out a vehicle the night before and then just go from your house to one of the east offices?*

A:   *No.*

Q:   *Is that something that is permitted?*

A:   *It is permitted, but it doesn't happen very often.*

Q:   *Why not?*

A:   *The biggest thing is, if you check out a GSA vehicle and take it to your home, and that's the only vehicle at your home, and if you need to run to the bar that night, you can't use it.  You can't use it for personal reasons.  That would be the case for me.  I only have one vehicle at my home.*

*Id*. at 85:1-86:11 (emphasis added).  Therefore, any alleged lack of access to a GSA vehicle, considering USDA/FSA policy, cannot support Franks's gender discrimination claim.

**MEMORANDUM DECISION AND ORDER - 17**

Likewise, any argument that Franks may not have been reimbursed for any travel time to and from work ignores the regulatory limits of any such compensation when less than 50 miles is involved. *See* 5 C.F.R. § 550.112(j) ("An agency may prescribe a mileage radius of not greater than 50 miles to determine whether an employee's travel is within or outside the limits of the employee's official duty station for determining entitlement to overtime pay for travel . . . ."). Franks lives approximately 22 miles from the West District headquarters in Caldwell.  In contrast, Mr. Preston (as the former South District Director) traveled approximately 75 miles from his residence in Preston (in Franklin County) to the South District headquarters in Pocatello (in Bannock County).  His reimbursement is therefore explicitly authorized.  It does not indicate discriminatory conduct against Franks.  As stated during oral argument, no other District Directors are/have been reimbursed for travel time to and from work.[6]

With all this in mind, any allegation that Franks was denied access to GSA vehicles or was not properly reimbursed for travel expenses is neither supported by the record, nor reflective of disparate treatment among District Directors (even assuming such allegations were true).[7] Such allegations therefore cannot operate to make out a prima facie case of gender discrimination.  Defendant's Motion for Summary Judgment is granted in this respect.

---

[6] Scott Riggers, the North District Director, was permitted to use his personally-owned vehicle when he traveled to Boise for leadership meetings, and he would be reimbursed for mileage at a reduced rate.  The record indicates, however, that he was permitted to do so because his wife had a medical condition, needed his assistance, and she was not permitted to travel in a government vehicle.  *See* Samson Decl., ¶ 13 (Dkt. 30-15).

[7] Franks cites *Washington v. Illinois Dep't of Revenue*, 420 F.3d 658 (7th Cir. 2005), as supporting the notion that "Defendant could not discriminate against [her] . . . by forcing her to use her own personal vehicle for agency business and then not compensate her that."  Opp. to MSJ, pp. 11-12 (Dkt. 35).  The case is inapplicable.  There, the Seventh Circuit ruled that an employer cannot make a work change that exploits a worker's "special vulnerability" – the plaintiff's son had Down's Syndrome and the sudden imposition of different work hours would adversely impact his care.  *See Washington*, 420 F.3d at 659.  Franks has no such special vulnerability.

**MEMORANDUM DECISION AND ORDER - 18**

- Performance Review

On at least once occasion, Franks claims that she was inadequately evaluated in a performance review which resulted in a lower performance rating than she deserved and she lost out on additional monetary awards/bonuses.  *See supra*.  Defendant understands this claim to relate to a performance rating of "fully successful," and a perceived lack of special recognition for an article Franks wrote as part of her normal duties.  *See* Def.'s Mem. ISO MSJ, pp. 18-19 (Dkt. 30-1).[8]  Such a claim does not establish a prima facie gender discrimination claim.

Even mediocre performance evaluations, by themselves, do not constitute an adverse employment action.  *See Lyons*, 307 F.3d at 118.  A plaintiff must instead show that the evaluation gave rise to further negative employment action.  *See id*.; *see also Chuang*, 225 F.3d at 1126 (finding that even if the action is "irritating," it is not an adverse employment action if it does not "materially affect the compensation, terms, conditions, or privileges of [the plaintiff's] employment").  Here, Franks alleges no such negative employment action, except to suggest that she would have received more money had she received appropriate recognition for her work.  However, there is no basis to conclude that a performance review indicating something more impressive than "fully successful" would have meant that Franks was absolutely entitled to receive something monetarily that she did not.  Therefore, Franks fails to explain or show how her performance review constitutes an adverse employment action to begin with.  Moreover, Franks is unable to show that similarly-situated individuals outside her protected class were treated more favorably.  Conclusory allegations are simply not enough.  *See, e.g.*, *Abram v. City*

---

[8]  The Court could not locate in the record the particular performance review(s) in question or, for that matter, the substantive thrust for the claim that Defendant improperly gave Franks an undeserved critical performance review (beyond the allegation itself).  Regardless, Franks does not dispute Defendant's characterization of the claim in her briefing – perhaps because it no longer represents a basis for her gender discrimination claim.  *See supra*.

**MEMORANDUM DECISION AND ORDER - 19**

*and County of San Francisco*, 2008 WL 4462104, at *3 (N.D. Cal. 2008) (finding that conclusory allegation that unidentified "white counterparts" were treated more favorably" does not rise to the level sufficient to create material dispute of fact").  Without either an adverse employment action or evidence of disparate treatment, there is no prima facie claim for gender discrimination in this setting.  Defendant's Motion for Summary Judgment is granted in this respect.

- West District Staffing

Franks submits that the West District was continuously understaffed, while other Districts, with male Directors, were more properly staffed more consistently and that the fact of such disparate staffing supports her gender discrimination claim.  *See supra*.  Even if these claimed differences represent an adverse employment action with disparate treatment favoring Districts headed by male Directors (such that Franks can make out a prima facie case of gender discrimination on this basis),[9] the Idaho FSA uses a coefficient formula to determine staffing needs.  *See* Def.'s Mem. ISO MSJ, p. 20 (Dkt. 30-1).  That formula was created primarily by a group of County Executive Directors, including two of Franks's long-time colleagues from the West District – Harold Boggs and Kyla Pearson.  *See id*.  Importantly, the coefficient formula did not take gender into account and was applied equally to all districts.  *See id*.; *see also* Samson Decl., ¶ 15 (Dkt. 30-15).  Franks confirmed as much during her deposition, stating:

> Q:      So are staffing needs within the District filled using that mathematical
>          formula?
>
> A:       The coefficient – today, a coefficient formula is used.

---

[9] This Memorandum Decision and Order does not explicitly make such a finding here; as discussed during oral argument, it is unclear whether these differences across Districts substantively amount to either an adverse employment action or disparate treatment.  Even so, the claim is rejected for separate reasons (*see infra*), rendering the separate resolution of those questions immaterial in the context of the arguments raised here.

**MEMORANDUM DECISION AND ORDER - 20**

Q:      What is a coefficient formula?

A:      There was a group of people, employees within the agency, that came together and determined the amount of time it took to process certain program applications.  And they established a formula with that time and created a formula that relates to the amount of time to determine which programs took the most – the biggest share of time.

Q:      So staffing needs, though, within the state of Idaho are done – are determined using a formula?

A:      Yes.

Q:      *Okay.  And is that formula applied the same way to all of the different Districts?*

A:      *Yes.*

Q:      How did they do so?

A:      There was a group of people, employees within the state – they were primarily county executive directors that were brought together – led by the administrative chief at the time, Jeff Mitchell.  And they went through a lot of documentation, their personal experience, and came up with the amount of time it took to take an application, from start to payment, and developed the time and, also, the formula associated with each of the programs.

Q:      Was anyone from your District involved in coming up with the formula?

A:      Yes.  There were two people.

Q:      Who from your District was involved?

A:      Harold Boggs and Kyla Pearson. . . . .

Q:      I think you said earlier Mr. Boggs is a CED; correct?

A:      Correct.

Q:      What about Kyla Pearson?  What is she?

A:      CED.

Q:      And you worked with Mr. Boggs for a long time; correct?

A:      Uh-huh.  Thirty-six years.

**MEMORANDUM DECISION AND ORDER - 21**

Q:      How about Kyla Pearson?  How long have you worked with her?

A:      Oh, man.  Ten?  Ten, twelve years.  Maybe – about twelve years.  And that's an estimate.

Q:      . . . .  So you said it was – the formula was developed by CEDs and, then, the administrative –

A:      Farm program chief.

Q:      Okay.  Do other states use a similar formula to the one used in Idaho to determine staffing needs?

A:      To my knowledge, no.

Q:      I have seen reference in some of the notes to something called CRP.  What is CRP?

A:      Conservation Reserve Program.

Q:      Yeah.  Do you believe that other Districts have a heavier CRP than your District?

A:      Yes.

Q:      And does that factor into the staffing?

A:      Yes.  Heavily.

Q:      Do you believe that the other Districts are more adequately staffed due to heavier CRP?

A:      Yes.

Q:      Have you raised that issue with anyone?

A:      Multiple times.

Q:      Who have you raised that issue with?

A:      Mark Samson, multiple times.  And Aaron Johnson, as acting.

Q:      And what has their response been?

A:      They believe that the committee that came together used the best information to be able to establish the coefficient for CRP, which is very heaving weighted, and gives counties with CRP a tremendous advantage.

**MEMORANDUM DECISION AND ORDER - 22**

Q:     *Do you believe the individuals who came up with the formula that determined staffing were attempting to discriminate against you in any way?*

A:     *No.*

Franks Depo. at 101:8-104:14, attached as Ex. A to Wucetich Decl. (Dkt. 30-4) (emphasis added).

In other words, staffing decisions within the FSA in Idaho were made on the basis of a gender-neutral formula applied across the Districts and not motivated by any discriminatory intent.  In this setting, then, there is no pretext; indeed, Franks's argument assumes only that she made out a prima facie case without addressing pretext at all.  Given that Defendant has provided a legitimate, nondiscriminatory reason for the possibly disparate staffing composition between Districts, absent any evidence of pretext, the *McDonnell Douglas* framework applies to upend Frank's gender discrimination on this premise.  Defendant's Motion for Summary Judgment is granted in this respect.

## B.     Retaliation Claim

A prima facie case of retaliation under Title VII requires the plaintiff to show that (1) she acted to protect her Title VII rights; (2) an adverse employment action was taken against her thereafter; and (3) a causal link exists between the two events.  *See Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).  If a plaintiff can make out a prima facie case, then the *McDonnell Douglass* three-stage, burden shifting framework applies as already described above under Franks's gender discrimination claim.  *See Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065-66 (9th Cir. 2003).

As compared to the adverse employment action prong of a gender discrimination claim, in the context of a retaliation claim, "adverse employment action . . . [is] any adverse treatment

**MEMORANDUM DECISION AND ORDER - 23**

that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity.'"  *Ray v. Henderson*, 217 F.3d 1234, 1242-43 (9th Cir. 2000) (quoting EEOC Compliance Manual Section 8, "Retaliation," ¶ 8008 (1998)).  The Ninth Circuit has described two "countervailing concerns" involved in deciding what constitutes an adverse employment action:

> On the one hand, we worry that employers will be paralyzed into inaction once an employee has lodged a complaint under Title VII, making such a complaint tantamount to a 'get out of jail free' card for employees engaged in job misconduct. On the other hand, we are concerned about the chilling effect on employee complaints resulting from an employer's retaliatory actions.  In an effort to strike the proper balance, we have held that only non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation.

*Brooks*, 229 F.3d at 928-29; *see also Burlington N. & Santa Fe Railway, Co. v. White*, 548 U.S. 53, 68 (2006) ("[I]t is important to separate significant from trivial harms.  Title VII, we have said, does not set forth 'a general civility code for the American workplace.' . . .  And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence [from engaging in protected activity].") (quoting *Oncale v. Sundowner Offshore Servs, Inc.*, 523 U.S. 75, 80 (1998)).  To establish a causal link between the protected activity and the adverse employment action, a plaintiff must show "that the desire to retaliate was the but-for cause of the challenged employment action."  *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)).

Franks initially alleges in her Complaint that she engaged in protected activity "when she raised legitimate concerns and complaints of gender discrimination in the workplace" and that "Defendant took negative, tangible employment actions against [her] for having raised [such concerns]."  Compl., ¶¶ 26-27 (Dkt. 1).  Though not stated explicitly within her Complaint, discovery apparently revealed that Franks claims that Mr. Samson committed four acts of

**MEMORANDUM DECISION AND ORDER - 24**

retaliation:  (1) Mr. Samson's denial of her request to buy self-help books or her staff; (2) the

state committee's denial of Franks's request to have Carol McKay appointed as program

technician in charge; (3) Mr. Samson's delay in approving her telework agreement; and (4) Mr.

Samson's purported warning during a January 19, 2017 meeting not to assert a harassment claim

against the next State Executive Director.  *See* Def.'s Mem. ISO MSJ, p. 25 (Dkt. 30-1) (citing

Franks Depo. at 201:18-203:7, attached as Ex. A to Wucetich Decl. (Dkt. 30-4)).  There is no

dispute that Franks engaged in protected activity (to the extent she raised concerns of gender

discrimination), but as to the alleged instances of subsequent retaliation, Defendant contends

there was (1) no adverse employment action to begin with; (2) no link between Franks's

protected activity and any adverse employment actions; and/or (3) non-pretextual, legitimate

reasons for any adverse employment actions.  *See* Def.'s Mem. ISO MSJ, pp. 25-29 (Dkt. 30-1).

Franks does not address these arguments specifically; instead, she frames her retaliation

claim as premised upon only these alleged adverse employment actions: (1) "Mr. Samson's

continued refusal to afford [her] a GSA vehicle and his continued refusal to compensate Plaintiff

for the use of her personal vehicle for employer-related business; and (2) the January 19, 2017

meeting where Mr. Samson "publicly and specifically advised [her] to refrain from filing any

discrimination complaints against the new, incoming leadership for the USDA/FSA in Idaho."

Opp. to MSJ, p. 14 (Dkt. 35).  As before, the Court will treat this unfolding of her contentions

over time as having now settled the record on the evolving scope of Franks's retaliation claim.

Still, these actions – even with all reasonable inferences viewed in the light most favorable to

Franks – cannot support a retaliation claim.

First, for the same reasons already discussed, Franks's access to a GSA/FSA vehicle

followed a state-wide USDA/FSA policy and, as-applied, did not prevent her from using a

GSA/FSA vehicle when needed.  *See supra*.  Further, travel reimbursements were not applied

**MEMORANDUM DECISION AND ORDER - 25**

disparately but rather paid consistent with the regulatory requirements based on the distance traveled.  Here, the distance Franks traveled did not qualify for reimbursement, unlike the distance traveled by Mr. Peterson, who was reimbursed.  *See supra*.

Second, had Mr. Samson said to Franks that she not file a discrimination complaint against the incoming State Executive Director (Mr. Samson denies this (*see* Samson Decl., ¶¶ 19-20 (Dkt. 30-15)), that action did not turn into an adverse employment action because it does not exemplify a disadvantageous change in the workplace – such as a lateral transfer, unfavorable job references, changes in work schedules, or denial of a promotion.  *See, e.g.*, *Limary v. United Parcel Serv., Inc.*, 2017 WL 4169410, at * 6 (D. Idaho 2017) (citing *Ray*, 217 F.3d at 1240; *Chuang*, 225 F.3d at 1120).  At most, the statement was unprofessional and in poor form.  It was not, however, actionable retaliation.  *See, e.g.*, *Fay v. Costco Wholesale Corp.*, 2012 WL 683176, at *6 (C.D. Cal. 2012) (holding that mere oral criticism without more does not constitute adverse employment action).

In sum, without the requisite adverse employment action, there can be no retaliation. Defendant's Motion for Summary Judgment is granted in this respect.

## IV.  ORDER

Based on the foregoing, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment or, in the Alternative, Partial Summary Judgment (Dkt. 30) is GRANTED in its entirety.

DATED: June 1, 2020

Ronald E. Bush
Chief U.S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 26**